IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

MIKE SAMADI,                    *
                                *
        Plaintiff,              *
                                *
    v.                          *        CV 109-02
                                *
BANK OF AMERICA, N.A.,          *
                                *
        Defendant.              *

---

**ORDER**

---

On October 30, 2008, Plaintiff Mike Samadi
("Plaintiff"), proceeding *pro se*, brought this action in
the Superior Court of Columbia County. (Doc. no. 1 at 17-
22.) Defendant Bank of America ("BOA") subsequently
removed the action to this Court pursuant to 28 U.S.C. §§
1331, 1441, and 1446. (Id. at 1-3.) In his complaint,
Plaintiff sets forth a litany of claims, based upon both
federal and state law, arising from various loan
transactions. Plaintiff asserts, *inter alia*, that
Defendant violated the Fair Credit Reporting Act and the
Truth in Lending Act.

Presently before the Court are the parties' cross-
motions for summary judgment and Plaintiff's motion to
voluntarily withdraw all federal claims and remand to the
Superior Court of Columbia County. Further, Plaintiff has

filed a motion to proceed *in forma pauperis* ("IFP") for the purpose of appealing several of this Court's prior orders.

## I. MOTION FOR LEAVE TO APPEAL IFP

On May 26, 2010, Plaintiff filed a notice of appeal of several of this Court's prior orders. (Doc. no. 57.) Subsequently, on June 7, 2010, Plaintiff filed a motion for leave to appeal IFP. (Doc. no. 61.) The next day, the Court informed Plaintiff that he had not provided the appropriate documentation in support of his motion. (Doc. no. 62.) Plaintiff then re-filed his motion with the appropriate documentation attached. (Doc. no. 67.)

Prior to the Court ruling on Plaintiff's motion to proceed IFP, the United States Court of Appeals for the Eleventh Circuit, *sua sponte*, dismissed Plaintiff's appeal for lack of jurisdiction because Plaintiff was attempting to appeal from orders that were neither final nor interlocutorily appealable. Accordingly, Plaintiff's motion to proceed IFP (doc. nos. 61 & 67) is **DENIED AS MOOT**.

## II. MOTION TO WITHDRAW FEDERAL CLAIMS AND MOTION TO REMAND

After BOA filed its motion for summary judgment, Plaintiff filed a "Motion to Voluntarily Withdrawal [sic]

Claims of Federal Statutes and Motion to Remand" (doc. no. 58),[1] which BOA opposes. In his motion, Plaintiff declares that he is withdrawing all claims based upon federal law. (Id. at 1.) Plaintiff argues that, in light of this declaration, the Court no longer has jurisdiction over this case, and must, therefore, remand the action to the Superior Court of Columbia County. (Id.) Essentially, Plaintiff is once again[2] belatedly requesting the Court's permission to amend his complaint, this time for the obvious purposes of defeating federal jurisdiction and avoiding an unfavorable decision from this Court.

---

[1] Plaintiff cites to no Federal Rule of Civil Procedure in support of his motion to withdraw his federal claims. The Court, however, shall construe his motion as a motion to amend pursuant to Federal Rule of Civil Procedure 15. See Boyce v. Augusta-Richmond Cnty., 111 F. Supp. 2d 1363, 1374 (S.D. Ga. 2000) ("Where a plaintiff seeks dismissal of a claim in a multi-count complaint . . . and does not seek dismissal of the entire action, the Court must treat the motion as a motion to amend the complaint to delete the particular claims under Rule 15(a).")

[2] In his briefs, Plaintiff *repeatedly* contends that the Court's previous denial (doc. no. 56) of his motion for leave to amend (doc. no. 45) was in error (see, e.g., doc. no. 73 at 4). In one of the rare instances in which Plaintiff refers to legal authority, Plaintiff asserts that it is the practice of this Circuit to allow *pro se* plaintiffs at least one opportunity to amend their complaint. (Id.) While the Court generally agrees with Plaintiff's statement of Eleventh Circuit practice, Plaintiff completely ignores the dilatory nature of his previous motion and its other substantial failings that were the basis of the Court's initial denial. See Long v. Satz, 181 F.3d 1275, 1279-80 (11th Cir. 1999) ("Failure to properly request leave to amend, when [the plaintiff] had adequate opportunity and time to do so, precludes the plaintiff's argument on appeal that the district court abused its discretion by denying . . . leave to amend [the] complaint.")
The Court also notes that this is Plaintiff's *second* attempt to avoid litigating this case in federal court. On July 9, 2009, Plaintiff filed what was titled, "Motion for Change of Venue to the Superior Court of Columbia County," which was essentially a motion to remand to state court based, in large part, upon Plaintiff's personal preference. (See Doc. nos. 28 & 48.)

Given the timing of Plaintiff's motion,[3] Federal Rule of Civil Procedure 16 is the "proper guide for determining whether [Plaintiff's] delay may be excused," Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998), and, therefore, the appropriate inquiry is whether Plaintiff has shown good cause for the delayed filing. See Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). With regard to this inquiry, the Eleventh Circuit has stated the following:

> District courts are required to "enter a scheduling order that limits the time to . . . join other parties and to amend the pleadings . . . ." Such orders "control the subsequent course of the action unless modified by a subsequent order," and may be modified only "upon a showing of good cause." This good cause standard precludes modification unless the schedule cannot "be met despite the diligence of the party seeking the extension."

Sosa, 133 F.3d at 1418 (citation omitted).

Despite the fact that the Court has already explained to Plaintiff the required showing for amending a scheduling

---

[3] A scheduling order was entered on February 19, 2009, wherein the Court set forth a deadline of March 10, 2009, for the filing of all motions to amend. (See Doc. no. 16.) Plaintiffs' motion to withdraw his federal claims and remand to state court (doc. no. 58) was thus filed over a year after the applicable deadline, after the parties had completed discovery and BOA had filed a motion for summary judgment.

The Court also notes that this is Plaintiff's *second* overt attempt to avoid litigating this case in federal court. On July 9, 2009, Plaintiff filed what was titled, "Motion for Change of Venue to the Superior Court of Columbia County," which was essentially a motion to remand to state court based, in large part, upon Plaintiff's personal preference. (See Doc. nos. 28 & 48.)

order (see doc. no. 48 at 5-6), Plaintiff still fails to address the reason behind the delayed filing of the present motion. Without such explanation, the Court cannot find that good cause exists.

Even if the Court were able to find that good cause exists, such that Plaintiff should be permitted an extension of the scheduling order deadline, Plaintiff's motion would still be denied. Federal Rule of Civil Procedure 15(a)(2) reads as follows: "[A] party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." "The types of reasons that might justify denial of permission to amend a pleading include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, and undue prejudice to the opposing party." Espey v. Wainwright, 734 F.2d 748, 750 (11th Cir. 1984) (citation omitted).

As stated above, Plaintiff's motion was filed, without explanation, more than a year after the deadline for amended pleadings and approximately seven months after BOA had filed its motion for summary judgment. Moreover, Plaintiff has demonstrated a stark pattern of delay throughout these proceedings. Further, Plaintiff's motion

appears to have been designed, at least in part, to avoid an impending adverse summary judgment determination. (See Doc. no. 73 at 2 ("Samadi's reason for remand was based on Hickman case—which emphasized the breach of contract claims and dismissed the federal statute claims.")). The Eleventh Circuit has held as follows with regard to these issues:

> It is not an abuse of discretion for a district court to deny a motion for leave to amend a complaint when such motion is designed to avoid an impending adverse summary judgment. . . . [And] it is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments and past the deadline for filing dispositive motions.

Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1315 (11th Cir. 2002) (citations omitted).

Based upon the foregoing, Plaintiff's motion to voluntarily withdraw his federal claims and to remand (doc. no. 58) is **DENIED**.

### III. MOTIONS FOR SUMMARY JUDGMENT

On October 15, 2009, BOA filed a motion for summary judgment. (Doc. no. 41.) Plaintiff subsequently requested (doc. nos. 45 & 47), and was granted (doc. no. 56), an extension of time to respond due to medical issues. On June 11, 2010, Plaintiff responded to BOA's motion and filed his own motion for summary judgment. (Doc. no. 63.)

With regard to both motions, the Clerk has given the non-moving party appropriate notice and has informed each party of the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. nos. 43 & 64.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motions are now ripe for consideration.

## A. Background

Plaintiff Mike Samadi is a real estate investor. (Samadi Dep. at 229:3, 280:24-25.) He buys properties and flips them for profit. (<u>Id.</u> at 229:4-5.) In addition to real estate investing, Plaintiff has worked for years as a consumer credit counselor and has written books on the subject. (<u>Id.</u> at 12:19, 264:19-20.) Over the course of the past several years, Plaintiff has had numerous business dealings with BOA regarding his own credit transactions and those of potential and actual purchasers of his properties. While Plaintiff's complaint addresses several different credit transactions, the transactions that can be reasonably construed to implicate federal law arise out of two lines of credit Plaintiff opened in January and

February of 2006.[4]   The pertinent facts surrounding these credit transactions are set forth below.[5]

### 1. January 2006 and February 2006 Lines of Credit

On January 25, 2006, Plaintiff opened a line of credit with BOA in the amount of $50,000.00.   (Id. at 266:16-267:7; Doc. no. 41, Ex. 9 at 2 ("This Agreement covers a revolving line of credit for the principal amount of Fifty Thousand & 00/100 Dollars.").)   The line of credit, account number ***4799 (the "January LOC"), was secured by Plaintiff's investment property at 3988 Hammonds Ferry Road, Evans, Georgia.   (Samadi Dep. at 267:14-268:7; Carpenter Decl. ¶¶ 6-8; Doc. no. 41, Ex. 9.)

Less than one month later, on February 16, 2006, Plaintiff opened a second line of credit with BOA in the

---

[4] In its motion for summary judgment, BOA appears to assume—for the sake of its argument—that each individual transaction identified in the complaint was meant to provide a separate basis for Plaintiff's federal claims.   However, in Plaintiff's five-count complaint, only a single count, Count V, specifically alleges a violation of federal law, presumably because the other factual allegations in the complaint speak to Plaintiff's state law claims.   Accordingly, for purposes of the Court's analysis of Plaintiff's federal claims, the Court shall only address those facts set forth, or incorporated by reference, in Count V, which concern Plaintiff's January and February 2006 lines of credit and Plaintiff's 2008 reapplications.

In any event, these credit transactions are the only ones identified in the complaint that could be reasonably construed to *arguably* implicate the federal laws cited by Plaintiff.   Furthermore, even if Plaintiff was asserting that the other business transactions identified in the complaint implicate the federal laws cited, those claims would also fail as a matter of law.   Thus, this Order should be construed as rejecting all federal claims raised by Plaintiff, whether or not directly addressed herein.

[5] In light of the fact that Plaintiff's federal claims fail as a matter of law, the Court has chosen not to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, as explained below; thus, the facts underlying Plaintiff's state law claims are not set forth in this Order.

amount of $35,700.00. (Samadi Dep. at 170:13-171:4; Doc. no. 41, Ex. 11; Carpenter Decl. ¶¶ 9-10.) The second line of credit, account number ***8699 (the "February LOC"), was secured by another of Plaintiff's investment properties; this particular property was located at 3715 Elmwood Court, Hephzibah, Georgia. (Samadi Dep. at 94:21-25.)

Both the January and February LOCs were "revolving line[s] of credit" that permitted Plaintiff to borrow, repay any portion, and re-borrow up to the amount of the respective credit limits. (See Doc. no. 41, Ex. 9 at 2 & Ex. 11 at 2 ("This Agreement covers a revolving line of credit . . . .").) Both LOC agreements signed by Plaintiff provide as follows with regard to the suspension or reduction of credit due to changed circumstances:

> In addition to any other rights [BOA] may have, [BOA] can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect: (1) The value of your *property declines significantly below* the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances. (2) We reasonably believe that you will be *unable to fulfill your payment obligations* under your Credit Line Account due to a material change in your financial circumstances. . . .

(Doc. no. 41, Ex. 9 at 5 & Ex. 11 at 5.)

## 2. Reapplication for Lines of Credit to Add Second Guarantor

In early 2008, Plaintiff re-applied for new lines of credit to replace the January and February LOCs in order to add his business partner, Bradley Kirkland, as a second party guarantor. (Samadi Dep. at 93:23-94:15, 99:19-23.) This reapplication was motivated, at least in part, by Plaintiff's desire to improve Mr. Kirkland's credit score. (Id. at 138:16-21.)

Upon reapplication,[6] BOA requested the homeowner's insurance policy declaration page on the co-borrower's residence, as required by the U.S. Patriot Act. (Carpenter Decl. ¶ 17; Doc. no. 41, Ex. 6 at 2; Doc. no. 41, Ex. 7 at 5-9.) Neither Plaintiff nor Mr. Kirkland produced the requested document and, instead, responded that Mr. Kirkland did not own his residence and thus had no homeowner's policy. (Samadi Dep. at 109:11-19.) It also came to light during the reapplication process that one of

---

[6] The Court acknowledges that this process caused Plaintiff substantial frustration in light of some confusion that occurred during the course of the reapplication process. For instance, initially, BOA mistakenly believed that the collateral property for both of the applications was Plaintiff's residence, 4555 Bettys Branch Way, Evans, Georgia, but this issue was later resolved after several phone calls between BOA and Plaintiff. (Samadi Dep. at 101:22-102:7; Doc. no. 41, Ex. 6 at 2.) The Court notes, however, that not every frustrated customer that encounters poor service is necessarily entitled to a legal remedy. This is an important point with regard to many of Plaintiff's claims in this lawsuit. The Court also notes that, when faced with an extended application process, Plaintiff made no attempt to withdraw his loan application or seek out another loan with another institution. (See Samadi Dep. at 154:3-6.)

Plaintiff's properties was the subject of a lawsuit involving the federal government. (Id. at 117:9-118:5.) Moreover, BOA became aware of a charge-off that, according to BOA, had been suppressed at the time Plaintiff's credit was pulled for the applications.[7] (Id. at 121:12-20; Doc. no. 41, Ex. 7 at 6.) Due to the issues that emerged during the reapplication process, Plaintiff's line of credit re-applications were denied. (Carpenter Decl. ¶ 18; Doc. no. 41, Ex. 7 at 6.)

### 3. Reduction in Credit Limit Due to Decreased Value of Collateral

In late June of 2008, as a result of a periodic review of collateral,[8] BOA determined that the property securing the February LOC, 3715 Elmwood Court, Hephzibah, Georgia, had declined significantly in value, from $102,000.00 to $91,750.00. (Carpenter Decl. ¶ 19.) As a result, pursuant to the February LOC agreement, BOA reduced Plaintiff's available line of credit from $35,700.00 to $10,500.00. (Carpenter Decl. ¶ 19; Samadi Dep. at 175:24-176:3.) While the February LOC agreement did not require that notice be

---

[7] While Plaintiff appears to dispute BOA's contention that this charge-off had been previously suppressed at the time his credit was pulled for the application, Plaintiff does not dispute that this charge-off existed at that time.

[8] Both the evaluation that resulted in the reduction of the line of credit, and the initial evaluation of the collateral property prior to approval of the February LOC were performed in-house, and, at no time, did BOA perform a physical inspection of the property. (Carpenter Decl. ¶ 13.)

given in the event of a credit limit reduction (see doc. no. 41, Ex. 11; Samadi Dep. at 193:24), BOA submits that it mailed an appropriate written notice, on or about June 26, 2008, to Plaintiff. (See Carpenter Decl. ¶ 4; Doc. no. 41, Ex. 6 at 3-4.) The letter informed Plaintiff that, as of June 25, 2008, his credit limit for the account ending in ***8699 had been reduced to $10,500.00 in light of the fact that a recent evaluation indicated that the value of the property securing the home equity line had declined. (Id.)

On July 2, 2008, Plaintiff tried to withdraw cash against his February LOC in order to enable him to join with a business partner in making an offer on an investment property; according to Plaintiff, he was, at this time, informed that his credit limit had been reduced as a result of the decline in the market value of his collateral property. (Samadi Dep. at 161:18-162:10, 228:19-229:5.) As a result of this credit limit reduction, Plaintiff was unable to obtain the funds he needed to make an offer on the property. (Id. at 229:1-5.)

### 4. Plaintiff's Claims

In his complaint, and throughout these proceedings, Plaintiff has consistently been unable, or unwilling, to identify—despite direct inquiries pertaining thereto—the *specific* provisions within the substantial pieces of

federal legislation he cites, which form the basis of his federal claims. (See, e.g., Compl. ¶ 14 ("[T]his action of BOA is in violation of the Fair Credit Reporting Act – 15 U.S.C. § 1681 et seq., FCRA Sections 601 thru 625, Fair and Accurate Credit Transaction Act (FACTA), Consumer Credit Protection Act (CCPA) 15 U.S.C. 1601 et seq."); Samadi Dep. at 212:14-22.) Nevertheless, the Court shall consider Plaintiff's claims as best that it can, given the limited direction provided by Plaintiff. In doing so, while Plaintiff cites the entire Consumer Credit Protection Act ("CCPA") as a basis for Count V, based upon the nature of the facts alleged and Plaintiff's response to BOA's summary judgment motion, the Court shall construe Plaintiff's claims as falling under the Truth in Lending Act ("TILA") and the Fair Credit Reporting Act ("FCRA").

### B. Summary Judgment Standard

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the

13

light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of

14

material fact and that it is entitled to judgment as a matter of law. _Jones v. City of Columbus_, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. _Clark_, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." _Id._ When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." _Fitzpatrick_, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." _Id._ at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained

in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

### C. Discussion

#### 1. Truth in Lending Act

Plaintiff appears to assert that BOA violated the TILA through its handling of his January and February LOCs and his subsequent reapplications. (Compl. ¶¶ 8-15; Doc. no. 63 at 2 ("Samadi has direct claims under CCPA, FCRA, TILA . . . .").) BOA contends that all the claims Plaintiff has brought under the TILA fail as a matter of law because Plaintiff's credit transactions were for business and/or commercial purposes. (Doc. no. 41, Ex. 2 at 11.)

The CCPA is a composite statute comprised of several consumer protection laws, including Title I, the TILA, 15 U.S.C. § 1601, et seq. The purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. The term "consumer," when used with reference to a credit transaction under the Act,

"characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction *are primarily for personal, family, or household purposes.*" 15 U.S.C. § 1602(h) (emphasis added). Accordingly, two elements must be present in every viable "consumer credit" claim brought under the Act, the party to whom the credit is extended must be a natural person, and the money, property, or services that are the subject of the transaction must be primarily for personal, family, or household purposes. See Am. Express Co. v. Koerner, 452 U.S. 233, 241 (1981).

At the outset, the Court notes that nowhere in the complaint does Plaintiff allege that any of the credit transactions at issue in this case involved the extension of credit "primarily for personal, family, or household purposes," 15 U.S.C. § 1602(h), an essential element of any TILA claim. See Hamilton v. Wells Fargo Bank, N.A., No. 09-04152, 2010 WL 1460253, at *2 (N.D. Cal. Apr. 12, 2010) (finding that receiver of home equity line of credit ("HELOC") had not stated a cognizable TILA claim after failing to allege that HELOC was for "personal, family, or household" purposes); Walsh v. JPMorgan Chase Bank, No. 09-04387, 2009 U.S. Dist. LEXIS 126251, at *6 (C.D. Cal. Dec.

8, 2009) ("Whether a HELOC was issued to a plaintiff 'primarily for personal, family, or household purposes' is an element of any TILA claim and therefore must be properly alleged in the complaint."); Schulken v. Wash. Mut. Bank, No. 09-02708, 2009 U.S. Dist. LEXIS 114030, at *12-13 (N.D. Cal. Nov. 19, 2009) ("Since Plaintiffs have failed to sufficiently allege that their HELOC was for 'personal, family, or household purposes,' the Court finds that Plaintiffs have failed to state a cognizable TILA claim."). Furthermore, Plaintiff has provided no evidence showing that there is any genuine issue of material fact regarding the purposes of the credit transactions at issue.[9] In fact, the record, including Plaintiff's own briefs, indicates that the extensions of credit and reapplications were for

---

[9] While Plaintiff may contend within his briefs that the lines of credit were for "personal use," it is clear, after a close reading, that Plaintiff is confused, however, as to what constitutes a "personal purpose" under the TILA. By all appearances, Plaintiff considers his investment business "personal" in light of the fact that he believes he is "not a real estate professional" (doc. no. 63, Ex. 5 at 2) and because he uses the funds obtained from his investment business to "build a better future for himself and family" (doc. no 63, Ex. 4 at 3-4). Plaintiff also admits in his briefs that he uses his "personal funds" to repair his rental properties. (Doc. no. 63, Ex. 5 at 2.)

However, credit transactions entered into primarily for the benefit of a real estate investment/rental business, such as Plaintiff's, are considered business or commercial in nature, rather than personal. See Sapenter v. Dreyco, Inc., 326 F. Supp. 871, 873 (E.D. La. 1971) ("While [the plaintiffs] have had other, full-time occupations, plaintiffs were nevertheless engaged in the 'business' of owning and renting real estate for profit. Extensions of credit for such purposes were not intended by Congress to come within the purview of the Truth in Lending Act."). The Court also notes that Plaintiff's conclusory assertions of "personal use" are contained only in his briefs. Plaintiff points to no actual evidence in the record showing that the money obtained from the credit transactions at issue was primarily for personal, family, or household purposes.

business or commercial purposes. See Smith v. Russellville Prod. Credit Assoc., 777 F.2d 1544, 1549 (11th Cir. 1985) ("[C]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes are exempt from the disclosure requirements.").

In the Eleventh Circuit, "[c]ourts will look to the purpose of the loan [or credit transaction] to determine whether it is covered by [the TILA]." Poe v. First Nat'l Bank of DeKalb Cnty., 597 F.2d 895, 896 (5th Cir. 1979).[10] In doing so, courts must "examine the transaction as a whole and the purpose for which the credit was extended in order to determine whether [the] transaction was primarily consumer or commercial in nature." Tower v. Moss, 625 F.2d 1161, 1166 (5th Cir. 1980); see also Adema v. Great N. Dev. Co., 374 F. Supp. 318, 319-20 (N.D. Ga. 1973) (examining credit transaction as a whole and determining that loan was for commercial purposes). "While prior jurisprudence is an aid to classification, the nature of the credit transaction is ultimately determined by the entire surrounding circumstances." Tower, 625 F.2d at 1166 n.4.

---

[10] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

As stated above, Plaintiff is a real estate investor who buys properties and flips those properties for profit.[11] Plaintiff readily admits in his briefs that he "obtained [the January 2006 and February 2006 lines of credit] for his properties."[12]  (Doc. no. 63, Ex. 5 at 4.)  Furthermore, Plaintiff acknowledged during his deposition that the reason for the January LOC was to repair his properties, and, more specifically, to repair the investment property that served as collateral for that particular LOC.  (Samadi Dep. at 267:14-268:7.)  Credit transactions for the purpose of supporting real estate investments, including rental properties, are considered business and/or commercial in nature, and are thus exempt from the purview of the TILA. See Sapenter, 326 F. Supp. at 873.

---

[11] Plaintiff not only admits this during his deposition (Samadi Dep. at 229:3-5, 280:24-25), but acknowledges this fact in his briefs (see doc. no. 63, Ex. 5 at 2 ("Samadi is an individual that among other [sic] works - buys, repairs, rents or from time to time sells his homes.")).  Plaintiff also states in his briefs that he "bought houses years ago and has rented them to generate additional income . . . ." (Id. at 3.)

[12] While the Court appreciates that it "must look not at how a loan is eventually used but, rather, at the purpose of a loan to determine if it is subject to the disclosure requirements of the TILA," Smith, 777 F.2d at 1549, the Court notes that Plaintiff's admitted uses of the funds also support that the purposes behind the lines of credit and reapplications were largely, if not entirely, commercial or business in nature.  For instance, Plaintiff states in his deposition that he learned of his reduced credit limit regarding his February LOC on July 2, 2008, when he went to BOA to withdraw from the LOC in order to obtain cash to support the purchase of an investment property. (Samadi Dep. at 228:23-229:5.)  In addition, on or about February 6, 2008, Plaintiff requested that his business partner, Bradley Kirkland, be added as a second party guarantor to both the January and February LOCs.  (Id. at 94:12-15.)

In conclusion, Plaintiff not only has failed to allege in his complaint that the credit transactions at issue in this litigation were entered into for the purpose of obtaining money, property, or services for personal, family, or household purposes, but he has also failed to point to or present any evidence showing that there is a genuine issue of material fact with regard to this particular issue. Indeed, the record, including Plaintiff's own deposition and briefs, shows that the money which was the subject of the credit transactions at issue here was for business or commercial purposes. Based upon the foregoing, BOA's motion for summary judgment should be granted as to Plaintiff's claims under the TILA.

## 2. *Fair Credit Reporting Act*

In addition to Plaintiff's claims under the TILA, Plaintiff also asserts that BOA violated the FCRA, 15 U.S.C. § 1681, *et seq.*

> In general, the FCRA was enacted to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. To achieve its purpose, the FCRA places distinct obligations on three types of entities: consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies.

Chipka v. Bank of Am., 355 Fed. Appx. 380, 382 (11th Cir. 2009).

Once again, Plaintiff points to no particular provision of the FCRA in his complaint nor does he identify what particular actions he is contending constitute a violation of the FCRA. When asked at his deposition about the factual basis underlying his FCRA claims, Plaintiff asserted that his claims were based upon BOA's reduction of his lines of credit without notice, the ultimate suspension of these accounts, and the fact that BOA reported the lines of credit as revolving when, according to Plaintiff, they were not revolving accounts. (Samadi Dep. at 195:23-196:7.) Plaintiff, however, never expressly states in what capacity he is suing BOA under the FCRA, but the Court concludes, based upon the facts alleged, that any obligations BOA may have had in the present context, arose out of its position as a furnisher of credit information. See Smith v. First Nat'l Bank of Atlanta, 837 F.2d 1575, 1578 (11th Cir. 1988) ("[W]here the Bank has reported information based solely on its own experience with one of its customers, the Bank is not acting as a 'consumer reporting agency,' within the meaning of the Fair Credit Reporting Act, because, *inter alia*, it has not furnished a 'consumer report' as that term is defined in the Act.").

Pursuant to [15 U.S.C.] § 1681s-2, the FCRA . . . imposes certain responsibilities on persons who furnish information to consumer reporting agencies. Under subsection (a), persons may not knowingly furnish inaccurate information to a consumer reporting agency, must correct any such furnished information, and must notify a consumer reporting agency when any information is disputed by a consumer. In accordance with subsection (b), furnishers of consumer credit information must also verify the sufficiency and accuracy of the information when notified by a consumer reporting agency of a credit-report dispute. Congress, however, expressly reserved enforcement of subsection (a) to governmental agencies and officials, thereby limiting a consumer's private cause of action against a furnisher of credit information to violations of § 1681s-2(b).

Chipka, 355 Fed. Appx. at 383. Accordingly, while "the FCRA prohibits furnishers of credit information from providing false information," the statute explicitly bars private suits for such violations. See Peart v. Shippie, 345 Fed. Appx. 384, 386 (11th Cir. 2009) ("[T]he FCRA prohibits furnishers of credit information from providing false information. However, the statute explicitly bars private suits for violations of this provision."); see also Quale v. Unifund CCR Partners, No. 09-0519, 2010 WL 1417903, at *4 (S.D. Ala. Jan. 29, 2010) ("Section 1681s-2(a) of the FCRA prohibits furnishers of credit information from providing false information; however, the statute explicitly bars private suits for violations of this provision." (citation omitted)).

Thus, to support an FCRA claim against a "furnisher of credit information," a private plaintiff must show evidence that the furnisher, after receiving proper written notice of a dispute regarding the completeness or accuracy of any information provided by a person to a consumer reporting agency, did one of the following: failed to conduct an investigation with respect to the disputed information; failed to review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of the FCRA; failed to report the results of the investigation to the consumer reporting agency (and/or, if the investigation found that the information was incomplete or inaccurate, failed to report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis); or, if an item of information disputed by a consumer is found to be inaccurate, incomplete, or cannot be verified after any reinvestigation, the furnisher failed to modify, delete, or permanently block the reporting of that item of information. See 15 U.S.C. § 1681s-2(b).

Plaintiff does not allege in his complaint, or provide facts from which the Court could infer, that BOA failed to conduct a proper investigation, as required under 15 U.S.C.

§ 1681s-2(b), nor does Plaintiff allege or provide facts showing that BOA failed to report the results of its investigation to the proper entities. Further, Plaintiff's complaint contains no facts showing that BOA failed to modify, delete, or block information, after finding that the information it was providing to credit reporting agencies was inaccurate, incomplete, or could not be verified.

More importantly, Plaintiff has neither presented nor pointed to any evidence in the record that shows that there is a genuine issue of material fact that precludes summary judgment. For instance, there is no evidence in the record showing that BOA ever failed to initiate an investigation or respond after receiving notice of a dispute regarding Plaintiff's credit report. In fact, Plaintiff admits during his deposition that, to his knowledge, BOA responded to the credit bureaus after being notified of a dispute and repeatedly confirmed that there was no problem with the information it was providing. (Samadi Dep. at 200:11-12.) The only relevant evidence before the Court shows that Plaintiff reported disputes regarding his credit to several credit bureaus and those credit bureaus notified BOA who confirmed that the information it was furnishing was

accurate. Such facts, on their own, do not support a claim under the FCRA against a furnisher of information.

Moreover, beyond Plaintiff's conclusory assertions, there is no evidence that BOA has ever reported any of Plaintiff's information inaccurately. Plaintiff repeatedly contends in his briefs and in his supporting affidavit that BOA incorrectly reported his "secured loan accounts"[13] as "revolving lines of credit" (see, e.g., doc. no. 63 at 3), yet never disputes the fact that the agreements he signed in order to obtain the January and February LOCs, both plainly state that the agreements "cover[] revolving line[s] of credit" (doc. no. 41, Exs. 9 & 11). Furthermore, while Plaintiff takes issue with the reasons and calculations underlying BOA's reduction in the credit available to Plaintiff under the February LOC and BOA's notification of this action (Compl. ¶¶ 12-15), Plaintiff does not dispute that his credit was in fact reduced and later suspended, as reported by BOA (see, e.g., doc. no. 63, Ex. 5 at 7 ("Samadi's February LOC credit limit was reduced.").)

---

[13] Plaintiff is somewhat inconsistent as to how he believes the accounts should be reported. Within a single paragraph of his briefs, Plaintiff, in contending that the LOCs should not be reported as "lines of credit," refers to the January and February LOCs as "loans for his properties" and "credit lines." (See Doc. no. 63, Ex. 5 at 5.)

Based upon the foregoing, Plaintiff's FCRA claims fail as a matter of law and summary judgment should be granted in favor of BOA.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's motion to withdraw all federal claims and to remand (doc. no. 58) is **DENIED**. Further, Plaintiff's motion to proceed IFP (doc. nos. 61 & 67) is **DENIED AS MOOT**.

As to the cross-motions for summary judgment, Defendant's motion (doc. no. 41) is **GRANTED** with regard to all federal claims asserted in the complaint and, thus, Plaintiff's motion (doc. no. 63) is **DENIED** to the same extent.

Having granted summary judgment in favor of Defendant as to all federal claims, the only claims that remain are Plaintiff's state law claims. The Court, however, declines to exercise its supplemental jurisdiction over these claims. See 28 U.S.C. § 1367(c)(3); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (noting that the Eleventh Circuit encourages "district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial"). Accordingly, the Clerk is **DIRECTED** to **REMAND** this case to

the Superior Court of Columbia County. See Myers v. Cent. Fla. Invs., Inc., 592 F.3d 1201, 1226 (11th Cir. 2010) ("[F]ederal district courts in removal cases must remand, rather than dismiss, state claims over which they decline to exercise supplemental jurisdiction.").

**ORDER ENTERED** at Augusta, Georgia, this _30th_ day of September, 2010.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA